Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS DORMAN, | Case No: |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| FIVE9, INC., MIKE BURKLAND, ROWAN TROLLOPE, DAVID WELSH, MICHAEL J. BURDIEK, KIMBERLY ALEXY, JACK ACOSTA, DAVE DEWALT, ROBERT ZOLLARS, SUE BARSAMIAN, and ANA PINCZUK, | |
| Defendants. | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Dennis Dorman ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1. This is an action against Five9, Inc. ("Five9" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and

1

78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Five9 by Zoom Video Communications, Inc. ("Zoom").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York City.[1]

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Five9 common stock.

---

[1] For example, the Company reportedly participated in conferences in New York City in recent years.

7. Defendant Five9, together with its subsidiaries, provides cloud software for contact centers in the United States and internationally. The Company is incorporated in Delaware. The Company's common stock trades on the NASDAQ under the ticker symbol, "FIVN."

8. Defendant Mike Burkland ("Burkland") is Chairman of the Board of the Company.

9. Defendant Rowan Trollope ("Trollope") is Chief Executive Officer and a director of the Company.

10. Defendant David Welsh ("Welsh") is a director of the Company.

11. Defendant Michael J. Burdiek ("Burdiek") is a director of the Company.

12. Defendant Kimberly Alexy ("Alexy") is a director of the Company.

13. Defendant Jack Acosta ("Acosta") is a director of the Company.

14. Defendant Dave DeWalt ("DeWalt") is a director of the Company.

15. Defendant Robert Zollars ("Zollars") is a director of the Company.

16. Defendant Sue Barsamian ("Barsamian") is a director of the Company.

17. Defendant Ana Pinczuk ("Pinczuk") is a director of the Company.

18. Defendants Burkland, Trollope, Welsh, Burdiek, Alexy, Acosta, DeWalt, Zollars, Barsamian, and Pinczuk are collectively referred to herein as the "Individual Defendants."

19. Defendants Five9 and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

20. On July 18, 2021, Zoom announced that it had entered into a definitive agreement to acquire Five9. As part of the agreement, Five9 shareholders will receive 0.5533 shares of Class A common stock of Zoom for each share of Five9. The press release announcing the Proposed

Transaction states, in pertinent part:

## Zoom to Acquire Five9

**The combination of Zoom's robust communications platform with Five9's intelligent cloud contact center will enable organizations to reimagine the way they engage with their customers**

July 18, 2021 21:04 ET | Source: Zoom Video Communications, Inc.

SAN JOSE, Calif. and SAN RAMON, Calif., July 18, 2021 (GLOBE NEWSWIRE) -- Zoom Video Communications, Inc. (NASDAQ: ZM) today announced it has entered into a definitive agreement to acquire Five9, Inc. (NASDAQ: FIVN), a leading provider of the intelligent cloud contact center, in an all-stock transaction valued at approximately $14.7 billion. Combining Five9's Contact Center as a Service ("CCaaS") solution with Zoom's broad communications platform will transform how businesses connect with their customers, building the customer engagement platform of the future.

*   *   *

Following the close of the transaction, Five9 will be an operating unit of Zoom and Rowan Trollope will become a President of Zoom and continue as CEO of Five9, reporting to Eric Yuan.

**Details on the Proposed Transaction**
As part of the agreement, Five9 stockholders will receive 0.5533 shares of Class A common stock of Zoom Video Communications, Inc. for each share of Five9, Inc. Based on the closing share price of Zoom Class A common stock as of July 16, 2021, this represents a per share price for Five9 common stock of $200.28 and an implied transaction value of approximately $14.7 billion.

The Boards of Directors of Zoom and Five9 have approved the transaction. The Board of Directors of Five9 recommends that Five9 stockholders approve the transaction and adopt the merger agreement. The transaction, which is anticipated to close in the first half of calendar year 2022, is subject to approval by Five9 stockholders, the receipt of required regulatory approvals and other customary closing conditions.

Additional details and information about the terms and conditions of the acquisition will be available in current reports on Form 8-K to be filed by Zoom and Five9 with the Securities and Exchange Commission.

**Advisors**
Goldman Sachs & Co. LLC is serving as exclusive financial advisor and Cooley

LLP is serving as legal counsel to Zoom. Qatalyst Partners is serving as exclusive financial advisor and Latham and Watkins LLP is serving as legal counsel to Five9.

\* \* \*

**About Zoom**

Zoom is for you. We help you express ideas, connect to others, and build toward a future limited only by your imagination. Our frictionless communications platform is the only one that started with video as its foundation, and we have set the standard for innovation ever since. That is why we are an intuitive, scalable, and secure choice for individuals, small businesses, and large enterprises alike. Founded in 2011, Zoom is publicly traded (NASDAQ: ZM) and headquartered in San Jose, California. Visit zoom.com and follow @zoom.

**About Five9**

Five9 is an industry-leading provider of cloud contact center solutions, bringing the power of cloud innovation to more than 2,000 customers worldwide and facilitating billions of customer engagements annually. The Five9 Intelligent Cloud Contact Center provides digital engagement, analytics, workflow automation, workforce optimization, and practical AI to help customers reimagine their customer experience. Designed to be reliable, secure, compliant, and scalable, the Five9 platform helps increase agent and supervisor productivity, connects the contact center to the business, and ultimately deliver tangible business results including increased revenue and enhanced customer trust and loyalty.

21. On August 26, 2021, the Company filed a Schedule 14A Definitive Proxy Statement under Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

22. The Proxy Statement, which recommends that Five9 shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Five9's financial projections; (ii) the financial analyses performed by Five9's financial advisor, Qatalyst Partners LP ("Qatalyst"), in connection with its fairness opinion; (iii) potential conflicts of interest involving Qatalyst; and (iv) potential conflicts of interest involving Company insiders.

23. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger;

5

(ii) Recommendation of the Five9 Board and Reasons for the Merger; (iii) Opinion of Five9's Financial Advisor; (iv) Projected Financial Information; and (v) Interests of Five9 Directors and Executive Officers in the Merger.

24. Unless and until the material misstatements and omissions (referenced below) are remedied before the September 30, 2021 shareholder vote on the Proposed Transaction, Five9 shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning Five9's Financial Projections**

25. The Proxy Statement omits material information concerning Five9's financial projections.

26. With respect to the Company's "Initial Five-Year Plan" and "Updated Five-Year Plan and Related Extrapolations" projections, the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Adjusted Gross Profit, (iii) Adjusted EBITDA, (iv) Non-GAAP Operating Income, and (v) Unlevered Free Cash Flow; and (2) a reconciliation of all non-GAAP to GAAP metrics.

27. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the

Proposed Transaction.

28. When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[2]

29. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning Qatalyst's Analyses

30. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Qatalyst.

31. The Proxy Statement fails to disclose the following concerning Qatalyst's "*Illustrative Discounted Cash Flow Analysis*": (1) all line items underlying the cash flows used in the analysis; (2) the individual inputs and assumptions underlying the (i) range of discount rates of 6.0% to 10.0%, and (ii) UFCF multiples of 25.0x to 42.5x; (3) the terminal value of the

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Sept. 17, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

Company; (4) the cash and cash equivalents of Five9, as of June 30, 2021; (5) the face value of Five9's outstanding convertible notes, as of July 14, 2021; (6) the value of Five9's finance leases, as of June 30, 2021; and (7) the number of fully diluted shares of Five9 common stock outstanding as of July 14, 2021.

32. The Proxy Statement fails to disclose the following concerning Qatalyst's "*Illustrative Selected Transactions Analysis*": (1) the closing dates for each transaction; and (2) the value of each transaction.

33. The valuation methods, underlying assumptions, and key inputs used by Qatalyst in rendering its purported fairness opinion must be fairly disclosed to Five9 shareholders. The description of Qatalyst's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Five9 shareholders are unable to fully understand Qatalyst's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Qatalyst

34. The Proxy Statement omits material information concerning potential conflicts of interest involving Qatalyst.

35. The Proxy Statement provides that, "[u]nder the terms of its engagement letter, Qatalyst Partners provided Five9 with financial advisory services in connection with the merger for which it will be paid an amount currently estimated at approximately $100 million (provided, that the final actual fee will be based on an average of the closing price of Zoom Class A Common Stock over ten (10) consecutive trading days up to and including the second trading day

immediately preceding the closing of the merger, and, accordingly, the final fee may vary significantly from this estimate)[.]"

36. The Proxy Statement, however, fails to specifically disclose how Qatalyst's fee is currently estimated to be approximately $100 million as calculated using the closing price of Zoom common stock during a certain time period prior to the closing of the merger, as well as the specific inputs used to calculate that compensation. Without this information, Qatalyst shareholders are unable to determine the range of Qatalyst's potential compensation and how those figures were derived. This information is material as Qatalyst's "final fee may vary significantly from this [$100 million] estimate."

37. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

38. The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

    **4. Material Omissions Concerning Company Insiders' Potential Conflicts of Interest**

39. The Proxy Statement omits material information concerning potential conflicts of interest involving Company insiders.

40. According to the July 18, 2021 press release announcing the Proposed Transaction, "[f]ollowing the close of the transaction, Five9 will be an operating unit of Zoom and Rowan Trollope will become a President of Zoom and continue as CEO of Five9, reporting to Eric Yuan."

9

41. The Proxy Statement further provides that:

*New Compensation Arrangements with Zoom*

In connection with the merger agreement and contingent upon the closing of the merger, Rowan Trollope has entered into an employment offer letter with Zoom pursuant to which Mr. Trollope will serve as a president of Zoom and Chief Executive Officer of Five9 following the closing. Under the offer letter, Mr. Trollope will be entitled to an annual base salary of $600,000, and will have a target annual bonus opportunity equal to 100% of his annual base salary (with a maximum potential payout of 120% of his annual base salary). Additionally, effective as of the closing, Mr. Trollope will be granted an award of Zoom restricted stock units (which we refer to as a "Zoom RSU award") with a grant date value of $40 million. The Zoom RSU award will vest as to 50% of the underlying units on the second anniversary of the closing date, and as to the remaining 50% of the underlying units on the third anniversary of the closing date, subject to Mr. Trollope's continued employment.

42. The Proxy Statement, however, fails to disclose the details of all employment-related and compensation-related discussions and negotiations concerning the Company's officers and directors, including the parties to such communications, when they occurred, and the specific content discussed/communicated.

43. Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to shareholders. This information is necessary for shareholders to understand potential conflicts of interest of management and the Board. Such information may illuminate the motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.

44. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

10

46. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

47. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

48. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

49. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

50. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

51. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

55. In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2021

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
zhalper@halpersadeh.com

*Counsel for Plaintiff*